IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JENNIFER POTTER, | ) | CASE NO. 8:10CV25 |
| Plaintiff, | )<br>)<br>) | |
| vs. | )<br>) | MEMORANDUM<br>AND ORDER |
| MICHAEL J. ASTRUE,<br>Commissioner of the Social Security<br>Administration, | )<br>)<br>)<br>) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* The Court has carefully considered the record and the parties' briefs (Filing Nos. 13, 18).[1]

## PROCEDURAL BACKGROUND

The Plaintiff, Jennifer Potter, applied for benefits on November 4, 2004. (Tr. 122.) The claims were denied. (Filing No. 98.)[2] She appealed to an administrative law judge ("ALJ"). ALJ James F. Gillet held an evidentiary hearing on January 17, 2007 (Tr. 670-

---

[1] The Court has not considered the reply brief filed on November 26, 2010 (Filing No. 21). In stating clearly that this case would be ripe on November 13, 2010, the day following the deadline for submitting the Plaintiff's responsive brief, the Court did not contemplate reply briefs. (Filing No. 17.)

[2] The state of the provided record makes it impossible for the Court to provide accurate citations for the procedural summary. No detailed list of exhibits relating to the procedural aspects of the case is included; the relevant documents are only described as "jurisdictional documents and notes" at pages 53-121. (Tr. 1.) Also, dates on some of the documents are nonexistent or illegible. (*See, e.g.,* Tr. 110, 114, 118.) The Court has summarized the procedural history from the available data in court and administrative records.

711), and he issued an unfavorable decision on June 29, 2007. (Tr. 31.) The Appeals Council vacated the ALJ's decision and remanded the case to the ALJ for resolution of specific issues. (Tr. 29-33.) The ALJ held a second hearing on April 17, 2008 (Tr. 712-50), and issued a second unfavorable decision on June 5, 2008. (Tr. 18–28.) The Appeals Council denied Potter's request for review. (Tr. 8.) Therefore, Potter now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").

Potter claims that the ALJ's decision was incorrect because the ALJ improperly discounted the opinion of treating physician Dr. Susan Swindells by relying on his personal opinion and speculation, without contacting Dr. Swindells for clarification of inconsistencies within her opinion, and improperly relying on Potter's ability to care for herself and her children.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

*Documentary Evidence*

Potter, now 32 years old, alleges a disability date beginning May 1, 2004, due to HIV, manic depression, low back pain, anemia, and headaches. (Tr. 27, 240-41.) Before her alleged onset of disability, Potter completed some college. Her sparse work history consisted of customer service. (Tr. 241, 245.)

On August 24, 2004, about four months after her alleged onset date, Carlos Prendes, M.D., examined Potter. He advised Potter that she tested positive for HIV, and

2

noted that she was about eleven weeks pregnant. (Tr. 565.) He ordered additional blood tests. (Tr. 565.)

Two days later, Potter went to the emergency room after a car accident. (Tr. 502–07.) An examining physician diagnosed knee and abdominal contusions, and prescribed Tylenol and rest. (Tr. 502.)

Dr. Prendes examined Potter again on September 8, 2004. Potter was "doing well." (Tr. 565.) Dr. Prendes observed that Potter's viral load was undetectable. He decided to confirm the HIV test and also test for HIV 2 antibody. (Tr. 565.)

Dr. Prendes referred Potter to Alfred Fleming, M.D., who examined her due to her pregnancy with complications on October 14, 2004. (Tr. 570–73.) Potter appeared "happy," "well adapted to her pregnancy," and in no acute distress. (Tr. 570.) Dr. Fleming found that Potter showed intact sensory function, nerves, and reflexes. (Tr. 571.) Dr. Fleming performed an ultrasound and noted no fetal abnormalities. (Tr. 572.)

Dr. Prendes also referred Potter to Mark Goodman, M.D., who examined her on November 11, 2004. Dr. Goodman diagnosed HIV, pregnancy, and anemia. (Tr. 528.)

On December 20, 2004, Dr. Prendes informed Potter that her viral load remained undetectable. He also noted that Potter had a low hemoglobin level. (Tr. 564.) Dr. Prendes urged Potter to take her iron supplements that she was not taking due to nausea. (Tr. 564.)

On January 10, 2005, Potter returned to the emergency room in her seventh month of pregnancy to report intermittent back pain. (Tr. 492–501.) A physician placed her on temporary physical restrictions. (Tr. 496.) During a followup with Dr. Prendes the next day, Potter complained of chills and back pain. Dr. Prendes suggested iron injections as a

substitute for oral iron pills, and he diagnosed a urinary tract infection.  He suggested that Potter return in one month.  (Tr. 556.)

Dr. Goodman again examined Potter on January 18, 2005.  (Tr. 523.)  Potter reported a cold and fatigue.  (Tr. 523.)  At Dr. Prendes's request on January 27, 2005, Michael Barsoom, M.D., performed an ultrasound.  (Tr. 560–62.)  Potter reported no complaints.  Dr. Barsoom noted adequate fetal growth since the previous ultrasound.  (Tr. 561.)  On January 28, 2005, Dr. Prendes administered an initial iron injection.  (Tr. 556.)  On February 14 and 23, 2005, Potter received her second and third injections.  (Tr. 548, 555.)  On March 18, 2005, Potter gave birth.  She and her infant tolerated the normal delivery well.  (Tr. 543–44.)

On March 22, 2005, Dr. Prendes issued a "medical report" describing Potter's condition.  (Tr. 534–35.)  He noted that Potter was "requesting Disability support in conjunction with her prenatal care."  (Tr. 534.)  Dr. Prendes noted that Potter had cared for two small children on her own during her pregnancy.  (Tr. 534.)  He claimed that Potter exhibited weakness and decreased exercise tolerance, but her overall energy level continued to improve following the birth of her youngest child.  (Tr. 534–35.)  Dr. Prendes concluded that "at this time, she would still qualify as a person unable to work outside of the home in light of her many responsibilities as well as routine maternal leave."  (Tr. 535.)

On May 10, 2005, Donald Larson, M.D., a state Disability Determination Services ("DDS") physician, completed a non-examining residual functional capacity ("RFC") assessment.  (Tr. 353–61.)  Dr. Larson observed that Potter was tired due to an iron deficiency, but he noted that she would likely improve after the birth of her child.  He also observed that Potter's HIV appeared well controlled.  (Tr. 361.)  Dr. Larson opined that

4

Potter could lift twenty pounds occasionally and ten pounds frequently, and she could sit, stand, or walk for about six hours in an eight-hour workday. (Tr. 354.) He also stated that Potter could occasionally stoop, kneel, crouch, crawl, or climb ramps or stairs. (Tr. 355.)

On August 3, 2005, Dr. Prendes completed an RFC questionnaire. (Tr. 529–33.) He opined that Potter should be limited to low-stress work because of her "high level [of] underlying stress due to illness [and] child rearing." (Tr. 530.) Dr. Prendes stated that Potter could walk ten city blocks without rest and could stand for one hour at a time and sit for two hours at a time in an eight-hour workday. (Tr. 530.) He also indicated that Potter could sit, and also stand or walk, for four total hours each during the workday. (Tr. 531.) Dr. Prendes indicated that Potter could lift twenty pounds occasionally and ten pounds frequently, and she could twist, stoop, crouch, climb, turn her head, look down, or hold her head still only occasionally. (Tr. 531-32.) Dr. Prendes's report stated that Potter could use her hands, fingers, and arms 100% of the workday.

On November 10, 2005, Potter again saw Dr. Prendes. (Tr. 617.) She complained of migraine headaches and persistent fatigue. (Tr. 617.) Dr. Prendes prescribed migraine medication, ordered lab work, and discussed with Potter the importance of maintaining a healthy lifestyle to maintain her white blood cell count. (Tr. 617.) On December 2, 2005, Potter complained of a sore throat, fever and chills, and Dr. Prendes assessed strep/tonsilitis. He prescribed medication. (Tr. 617.)

On January 10, 2006, Potter returned to Dr. Prendes for a checkup. Dr. Prendes noted that Potter was tolerating her medications. He recommended dietary changes and exercise. (Tr. 616.)

On April 12, 2006, Dr. Prendes referred Potter to Susan Swindells, M.D., a physician at the University Medical Center. (Tr. 611, 615.) During Potter's initial appointment on May 8, 2006, she complained to Dr. Swindells of fatigue and childcare problems. Dr. Swindells noted that Potter had a flat affect and looked "a little anemic," but Potter otherwise appeared in good health. Dr. Swindells also mentioned that while Potter said she had been diagnosed as bipolar she had not received any medical care for the disorder. (Tr. 611.)

On May 9, 2006, Hassan Dakroub, M.D., another physician at the Medical Center, examined Potter. (Tr. 608–10.) Potter told Dr. Dakroub that she recently completed paralegal training, but could not work due to fatigue that she attributed to her anemia. (Tr. 608.) Potter reported occasional headaches. Dr. Dakroub diagnosed HIV with a well-preserved CD4 count, migraine headaches, asthma controlled with an inhaler, and bipolar disorder. (Tr. 609.) He referred Potter to a dentist and a dietician. (Tr. 610.)

On May 22, 2006, Potter returned to Dr. Swindells. Dr. Swindells observed that Potter had well-controlled HIV and ongoing anemia and fatigue. She adjusted Potter's HIV medications, which she felt might help Potter's anemia. (Tr. 607.)

On August 21, 2006, Potter saw Ahmad Nusair, M.D., another physician at the Medical Center. (Tr. 602-03.) Potter reported no complaints aside from a sleep disturbance, and she denied any depression. (Tr. 602.) Dr. Nusair described her HIV as well controlled and noted Potter's compliance with her medication regimen. The exam was unremarkable. (Tr. 603.)

On September 15, 2006, Potter returned to Dr. Prendes and reported dizziness and a sensation of heaviness in her right arm. Dr. Prendes found no muscle weakness and prescribed medication for vertigo. (Tr. 613.)

On September 27, 2006, Dr. Swindells completed an HIV medical assessment questionnaire. (Tr. 589–94.) She indicated "marked difficulties in completing tasks in a timely manner due to concentration, persistence, or pace." (Tr. 592.) She also stated that Potter's symptoms would constantly interfere with the attention and concentration necessary for simple tasks. Dr. Swindells indicated Potter could sit and stand, or simply stand, continuously for more than two hours at one time, but could stand and walk for less than two total hours in an eight-hour workday. She stated Potter could sit for a total of about four hours in an eight-hour workday. (Tr. 593.) After any of those activities Dr. Swindells stated that Potter would need to lie down. Dr. Swindells stated that Potter required five unscheduled two-hour breaks during an eight-hour workday. (Tr. 594.) She indicated that Potter would be "[u]nable to meet competitive standards" in two areas of mental functioning. (Tr. 595.) She estimated that Potter would be absent more than four days monthly due to her symptoms and medical treatment. (Tr. 594.)

When Dr. Goodman saw Potter for an HIV checkup on December 7, 2006, she reported a "tightness" in her chest. (Tr. 524.) On December 18, 2006, Potter complained to Dr. Swindells about of a "migraine" and fatigue and stated that her iron supplements made her nauseous. Potter told Dr. Swindells it is difficult to care for her three young children and asked the doctor to send a letter to Medicaid requesting daycare for them even though she was not working. (Tr. 600.) Dr. Swindells noted that Potter's HIV was "well controlled" and also diagnosed her with iron-deficiency anemia and hyperlipidemia.

7

The doctor noted that she would administer iron injections and gave her a note for Medicaid requesting "some assistance" for childcare. (Tr. 601.)

On December 27, 2006, Dr. Prendes completed another form on Potter's behalf. (Tr. 620.) In it, he indicated that his August 2005 RFC questionnaire responses were still accurate. (Tr. 620.)

On March 16, 2007, Potter saw Ann Fitzgerald, a registered nurse at the University Medical Center. (Tr. 638–39.) Potter reported occasional migraines and chills. (Tr. 638.) On June 18, 2007, Ziba Jalali, M.D., a physician at the Medical Center, again saw Potter for a checkup. (Tr. 636–37.) Potter complained of "slight" left knee pain, and denied major problems. Dr. Jalali noted "no limited range of motion" and that he did "not feel any fluid or any filling" in Potter's left knee. (Tr. 636.) His diagnoses included well controlled HIV. (Tr. 637.) On October 22, 2007, Potter saw Frances Van Meter, a registered nurse at the Medical Center. (Tr. 634-35.) Although Potter complained of a cough and nausea, she was in "no acute distress." (Tr. 634.) The examination was unremarkable. (Tr. 635.) On January 21, 2008, Mr. Van Meter again examined Potter. (Tr. 631–32.) Potter complained of fatigue and depression. (Tr. 631.) Mr. Van Meter noted that Potter was behind with her Pap smear and immunizations, and her cholesterol was quite elevated, perhaps due to one of her medications. He recommended a different HIV medication. (Tr. 632.)

On February 4, 2008, Potter returned to the Medical Center to report a rash. (Tr. 629.) Dr. Jalali instructed Potter not to take her new HIV medication. (Tr. 629.) On February 8, 2008, Mr. Van Meter noted that Potter's rash had cleared. (Tr. 627-28.) He advised her to resume her old HIV medications that had been changed because of her cholesterol, which would be treated with a cholesterol-specific medication. (Tr. 627.)

*Potter's Testimony*

On April 17, 2008, Potter testified at her administrative hearing held before the ALJ. She stated that she lived with her three children, then aged seven, five, and three. (Tr. 715.) The older two children were in school, and the three-year-old was with Potter half the time and Potter's parents the other half. (Tr. 716.) Potter stated that she was unable to care for her three-year old for time the child was in her care, and therefore the child spent most of that time with a neighbor. (Tr. 723.) She testified that her onset date was May 1, 2004, and since then she supported herself with "ADC" in the amount if $435 per month. Any child support from the father(s) of her children went to the state in light of her ADC support. (Tr. 716.) The ALJ confirmed with Potter's attorney that Potter's ailments were HIV, asthma, low back pain, manic-depressive or adjustment disorder, anemia, and headaches. (Tr. 717.) Potter stated that her family doctor prescribed Zoloft for her mental symptoms, and a therapist with Beneficial Health Behaviors had been working with her for a month. (Tr. 717-19.) The same therapist also worked with Potter's older daughter, and Potter took parenting classes through the same agency. (Tr. 718.)

Potter testified that she saw two primary care physicians: Dr. Prendes, who treated her mental symptoms; and Dr. Swindells. (Tr. 719-20.) She saw Dr. Swindells every three to four months. (Tr. 720.) Potter considered fatigue to be her most problematic symptom, and she testified that she "sleeps the day away." (Tr. 721, 722.) Potter attributed her fatigue to her iron deficiency and stated that her iron supplement did not help. (Tr. 723.) She testified that she lay down between six to seven hours during the day between 9:00 a.m. and 5:00 p.m. (Tr. 724.) She said she cleaned her apartment, but "not very well" and with the help of her children. A service delivered groceries to her home. She cooked

9

meals, but it was difficult for her. (Tr. 725.) Potter testified that she unpredictably vomited or had diarrhea three to four times daily due to her HIV medications; however, she did not soil herself. She needed to use the bathroom four to six times between 9:00 a.m. and 5:00 p.m. (Tr. 726.) Potter stated that her headaches were "better," and she was experiencing one every two to three months. When she had a headache, she slept. (Tr. 727.) Potter said her HIV medications resulted in body aches that came and went. (Tr. 727-28.) She took no medication for the aches, and she went about her usual day despite the pain. Her viral load for HIV had been undetectable for some time at the time of the hearing. She testified she got HIV from a partner she was with for thirteen years. (Tr. 728.) She was not in a relationship at the time of the hearing. (Tr. 729.)

Potter does not drive, have a driver's license,[3] and does not use alcohol or illegal drugs. (Tr. 728.) She goes out with other families, to the movies, or to dinner, but "[n]ot very often." (Tr. 729.) She attends church once or twice a month. She is in a support group through the Nebraska AIDS Project, but she has difficulty getting to the meetings. (Tr. 729.) Potter testified that her asthma is well controlled and she uses her inhaler about once a week. (Tr. 729-30.)

*Discussion Among the ALJ and Parties*

After Potter testified, an off-the-record discussion was had. The ALJ summarized the discussion, relating to the reason for the Appeals Council's remand due to the lack of support in the medical record for Potter's statements regarding her fatigue. The ALJ

---

[3]Potter stated her license was suspended in 2002 for being in an accident without proof of insurance. (Tr. 745.)

discussed available options. (Tr. 731-33.) The record was not closed. The ALJ noted that he has not been impressed with Dr. Swindells' reports in other cases. (Tr. 733.)

The ALJ stated the medical record does not support depression or a mood disorder. (Tr. 734.) As with the issue of fatigue, the ALJ left the record open for any additional supporting medical evidence with respect to Potter's alleged mental impairments.

*Vocational Expert's Testimony*

The ALJ consulted a vocational expert ("VE"), Anita Howell,[4] at the hearing. He asked the vocational expert to consider a hypothetical claimant with Potter's RFC. (Tr. 746.) The vocational expert testified that the hypothetical claimant could work as: a food and beverage order clerk, with 230 jobs in the state and 27,600 in the national economy; and as a charge account clerk, with 400 jobs in the state and 41,700 nationwide. (Tr. 748.)

*Post-Hearing Evidence*

On May 15, 2008, Dr. Swindells completed a second questionnaire asking her to interpret test results in the record. She indicated that Potter's test results showed low hemoglobin, which is often associated with anemia and fatigue. (Tr. 644–47.)

## THE ALJ'S DECISION

After following the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920,[5] the ALJ concluded that Potter is not disabled in either the disability or the SSI context. (Tr. 28.) The ALJ noted that Potter met the insured status requirements of

---

[4] Ms. Howell's curriculum vitae appears in the record. (Tr. 62-66.)

[5] Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits. For simplicity, in making further references to the social security regulations the Court will only refer to the disability regulations.

11

the Social Security Act through December 31, 2007. At step one the ALJ found that Potter had not performed substantial gainful work activity since May 1, 2004, her alleged onset date. (Tr. 20.) At step two, the ALJ found that Potter had the following medically determinable "severe" impairments: "low back pain, major depression disorder, HIV positive, asthma, anemia, and headaches." (Tr. 21.) With respect to Potter's low back pain, the ALJ gave her the benefit of the doubt since the pain was associated with labor pains. Because the medical record shows Potter had exhibited a flat affect and tearfulness, the ALJ also gave Potter the benefit of the doubt in considering her depression as a severe impairment, because she had not received significant treatment for her depression. (Tr. 21.)

At step three, the ALJ found that Potter's medically determinable impairments, either singly or collectively, do not meet section 12.04 or any other section of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." (Tr. 21-23.)

With respect to step four, the ALJ determined that Potter lacks the RFC to do her past relevant work. (Tr. 27.)

At step five, the ALJ found that Potter has sufficient RFC to perform sedentary work as follows:

> [Potter] cannot crawl, stoop, squat, kneel more than occasionally; cannot squat more than frequently;[6] cannot climb ropes or ladders; and cannot bend, twist, or turn more than frequently. The claimant['s] back pain prohibits the use of vibrating equipment and she should not work around moving machinery or unprotected heights. She cannot work around loud

---

[6]The undersigned recognizes the inconsistent findings with respect to squatting. However, resolution of the inconsistency is not determinative in the Court's analysis.

> background noises like heavy machinery or drill presses. She needs to use a bathroom but with appropriate undergarments, she can be accommodated through normal breaks. Making judgments on complex work elated decisions are moderately to markedly limited. Interacting appropriately with the public is markedly limited in regard to asking questions. Performing functions of a change taker could be done only slowly. The claimant would be very slow making complex decisions, which is slower than one would expect most of the time, but not all of the time. The claimant has no restrictions in reaching, handling, or fingering.

(Tr. 23.)

The ALJ's opinion included an in-depth analysis of Potter's testimony, as well as the documentary evidence including reports of treating physicians and state agency physicians. The ALJ's primary concern was the lack of support in the medical record for Potter's complaints. (Tr. 23-27.)

For these reasons, the ALJ concluded that Potter is not disabled.

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.* As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because

substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

Potter argues that the ALJ improperly discounted the opinion of Dr. Swindells, Potter's treating physician, based on the ALJ's subjective opinion and reliance on Potter's ability to care for herself and her children. Potter also argues that the ALJ neglected his duty to contact Dr. Swindells for clarification of any inconsistencies in her opinion.

The ALJ's analysis is consistent with the appropriate Social Security regulations, which state that a treating physician's opinion is given controlling weight "if, and only if, it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Johnson v. Astrue,* No. 09-3685, 2011 WL 31522, at *3 (8th Cir. Jan. 6, 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). The medical record includes numerous reports by Dr. Prendes, Potter's treating physician, stating that Potter's HIV was well controlled. Potter characterizes her headaches as migraines, but the record does not fully support that characterization. In any event, according to Potter's testimony the headaches are better and infrequent.

Potter's low back pain appears to be related to labor pain and was only considered a severe impairment by allowing her the benefit of the doubt. The medical record provides little, if any, support for low back pain as a disability. Low back pain is rarely mentioned by Potter as a significant problem, and it was not a focus of her medical treatment. Similarly, the ALJ considered depression as a severe impairment only after allowing Potter the benefit of the doubt. Potter has received little treatment for depression, despite the

recommendations of her treating physicians to do so.  Only one month before the hearing did Potter begin seeing a therapist, and the record does not reflect any psychiatric care.  Potter's lack of treatment for these alleged impairments indicates they are not disabling.  *Kirby v. Astrue,* 500 F.3d 705, 709 *8th Cir. 2007) (the lack of formal, long-term treatment provides substantial evidence that the impairment was "slight" and supports the ALJ's decision that the impairment had no more than a minimal effect on the claimant's ability to work).

Potter's most serious complaint is ongoing fatigue as the result of anemia caused by her HIV medications.  However, the record does not support the alleged seriousness of fatigue.  Potter conceived her youngest child just after her alleged onset date of disability.  Also, she cares for her special needs child and spends some of her time also caring for her other two young children.  The ALJ's explanation that child care is a demanding task is a factual analysis rather than an expression of personal bias against Potter as a single mother, as Potter argues.

The ALJ discussed in detail the inconsistent reports and forms submitted by Potter's treating physicians, Drs. Prendes and Swindells.  A treating physician's opinion may be discounted when the opinion is inconsistent.  *Hamilton v. Astrue,* 518 F.3d 607, 610 (8th Cir. 2008).  Contrary to Potter's argument, an ALJ does not have a duty to contact a treating physician for clarification of the physician's opinion before discrediting the opinion when the ALJ determines, based on sufficient evidence, that the opinion is "'inherently contradictory or unreliable.'"  *Samons v. Astrue,* 497 F.3d 813, 819 (8th Cir. 2007) (quoting *Hacker v. Barnhart,* 459 F.3d 934, 938 (8th Cir. 2006)).  The Court agrees with the ALJ's thorough analysis of both physician's opinions and his conclusion that they are

inconsistent, and substantial evidence supports those determinations. The ALJ's statements regarding Dr. Swindells' opinions in other cases does not appear to be a determining factor in his decision. The record as a whole includes substantial evidence to support his opinion. The Court is not persuaded by Potter's argument that the ALJ's view of Dr. Swindells' reports in other cases was a primary basis for his decision in her case, as the ALJ's reason for discounting her opinion is well supported.

While a claimant's apparent lack of motivation to work may not be considered as a dispositive factor, it is a factor used in determining the credibility of the claimant's allegations of pain. *Tuttle v. Barnhart,* 130 Fed. Appx. 60, 61 (8th Cir. 2005). As the ALJ stated, Potter's work history is sporadic and without any substantial earnings even before her alleged onset date of disability. The ALJ's statements that Potter is a single parent who supports herself through public assistance who became pregnant soon after her alleged onset date of disability appear not as biased statements; rather, these facts further support the conclusion that Potter is not motivated to work.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 12th day of January, 2011.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge